# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## CA 12-477 consolidated with CA 12-478, CA 12-479

**CYNTHIA BRIDGES, SEC. DEPT. OF REV., STATE OF LOUISIANA**

**VERSUS**

**NELSON INDUSTRIAL STEAM CO.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2008-6375 C/W 2010-3564 C/W 2010-5853
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Oswald A. Decuir, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**William Boyce Monk**
**Stockwell, Sievert, Viccellio, Clements & Shaddock**
**P. O. Box 2900**
**Lake Charles, LA 70602**
**(337) 436-9491**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Nelson Industrial Steam Co.**

**Linda Sarradet Akchin**
**Kean Miller**
**P. O. Box 3513**
**Baton Rouge, LA 70821-3513**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Nelson Industrial Steam Co.**

**Cheryl Mollere Kornick**
**Attorney at Law**
**701 Poydras Street, Suite 5000**
**New Orleans, LA 70139-5099**
**(504) 581-7979**
**COUNSEL FOR OTHER:**
 **Louisiana Chemical Association**

**Russell Joseph Stutes  Jr.**
**Stutes & Lavergne, LLC**
**600 Broad Street**
**Lake Charles, LA 70601**
**(337) 433-0022**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
 **Cynthia Bridges, Sec. Dept. of Rev., State of Louisiana**

**EZELL, Judge.**

Nelson Industrial Steam Company (NISCO) appeals the decision of the trial court granting summary judgment in favor of the Louisiana Department of Revenue (the State) and the Calcasieu Parish School System Sales and Use Tax Department (Calcasieu) in three consolidated cases concerning the application of the further processing exclusion from sales tax to its purchases of limestone and sand. For the following reasons, we hereby affirm the judgments of the trial court.

NISCO manufactures electricity and steam using Circulating Fluidized Boiler (CFB) technology. The CFBs produce heat energy which creates steam and activates turbines which generate electricity. NISCO uses petroleum coke (petcoke) as fuel in the CFBs. Petcoke contains sulfur, which if not captured, is emitted into the atmosphere. NISCO introduces limestone into the CFBs in order to control sulfur emissions. Its CFBs are specifically designed for the injection of limestone, and NISCO could not manufacture electricity and steam without the injection of limestone. Through the manufacturing process, limestone is turned into ash by the binding of the calcium in the limestone with the emitted sulfur. For a portion of the period at issue, NISCO also injected sand into the process in an attempt to prevent clogging of j-valves in the boiler system. NISCO sells all of the electricity generated to Entergy for resale to NISCO's members and all of the steam produced to one of its members. It sells its ash by-product to a third party for use in various commercial, industrial, and environmental applications.

NISCO did not pay sales and use taxes on the limestone and sand used, claiming they were purchased for further processing and, therefore, exempt from sales taxes. The State filed two suits for the collection of tax and interest owed on the

purchases of limestone and sand.  In one of the suits, the State also sought a penalty for the delinquent taxes.  NISCO filed one suit against Calcasieu for refund of sales tax, penalty, and interest paid under protest for the same purchases.  All three suits were consolidated in the trial court and are consolidated on appeal.

All three parties filed motions for summary judgment.  On September 16, 2011, a hearing was held on the motions.  The trial court rendered a ruling in favor of the State and Calcasieu, granting their joint motion for summary judgment, denying NISCO's cross motion, and awarding all taxes, penalties, and interest assessed in these matters.   From that decision, NISCO appeals.

NISCO first claims that the trial court erred in granting the State's motion for summary judgment where it alleges undisputed facts establish that the limestone and sand were purchased for further processing for sale.  We disagree.

An appellate court reviews a trial court judgment on a motion for summary using the de novo standard of review, "using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate, i.e., whether there is a genuine issue of material fact and whether the mover is entitled to judgment as a matter of law." *Supreme Servs. & Specialty Co., Inc. v. Sonny Greer, Inc.,* 06–1827, p. 4 (La. 5/22/07), 958 So.2d 634, 638.  The motion should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B).

The Louisiana Supreme Court set forth the law regarding further processing exclusions from Louisiana sales and use tax as follows in *International Paper, Inc. v. Bridges*, 07-1151, pp. 10-23 (La. 1/16/08), 972 So.2d 1121, 1128-35 (footnotes omitted)(first, second, sixth, seventh, and twelfth alterations in original):

2

LA.REV.STAT. § 47:302 is the statutory provision which outlines the imposition of sales and use taxes. Specifically, LA.REV.STAT. § 47:302(A) provides, in pertinent part:

> There is hereby levied a tax upon the sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state, of each item or article of tangible personal property, as defined herein. . . .

"Sale at retail" can take on different meanings, depending upon the taxing authority involved and/or the product(s) being sold. LA.REV.STAT. § 47:301(10)(a)(i) provides, in pertinent part:

> Solely for the purposes of the imposition of the state sales and use tax, **"retail sale" or "sale at retail" means a sale to a consumer or to any other person for any purpose <u>other than for resale</u> as tangible personal property** . . . . (Emphasis added).

Furthermore, LA.REV.STAT. § 47:301(10)(c)(i)(aa) (*i.e.,* the "further processing exclusion") provides:

> **The term <u>"sale at retail" does not include sale of materials for further processing into articles of tangible personal property</u> for sale at retail.** (Emphasis added).
>
> . . . .

While the issue of the proper interpretation of the "further processing exclusion" is not *res nova,* the Legislature has not yet delineated what, exactly, is meant by "materials for further processing into articles of tangible personal property." However, there is a DOR rule which specifically addresses the "further processing exclusion," and which may be found in the Louisiana Administrative Code. La. Admin. Code, Title 61, Part I, § 4301, *Retail Sale or Sale at Retail* (d) 2006)("LAC 61:I.4301"), provides:

> Sales of materials for further processing into articles of tangible personal property for subsequent sale at retail do not constitute retail sales. This exemption does not cover materials which are used in any process by which tangible personal property is produced, but only those materials which themselves are further processed into tangible personal property. ***Whether materials are further processed <u>or simply used in the processing activity will depend entirely upon an analysis of the end product</u>. Although any particular materials may be fully used, consumed, absorbed, dissipated or otherwise completely disappear during processing, if it does <u>not become a recognizable</u>***

***and identifiable component* which is of *some benefit to the end product*, it is not exempt under this provision. *The fact that a material remained as a recognizable component of an end product by accident because the cost of removal from the end product was prohibitive or for any other reason, if it does not benefit the property by its presence, it was not material for further processing and the sale is not exempt under this provision.*** (Emphasis added).

It is from the aforementioned rule that a "three-pronged test" developed, in order to determine the taxability of those materials purchased for further processing. As the Board noted in its decision:

> ***The Secretary's regulation,*** LAC 61:I.4301(10) ***and the case law provides*** that in order to be "material for further processing," as contemplated by the above statute, the raw materials or their component molecular parts must meet three criteria: (1) they must be of ***benefit*** to the end product; (2) they must be a ***recognizable and identifiable*** component of the end product, and (3) they must have been purchased for the ***purpose of reprocessing*** into the end product.
>
> . . . .

In *Traigle v. PPG Industries, Inc.,* 332 So.2d 777 (La.1976), this Court examined whether the purchase of graphite blades, utilized in the manufacture of chlorine, was excluded from the sales and use tax provisions. . . . The *Traigle* Court concluded:

> The Louisiana sales/use tax is a tax upon the sale at retail, use, consumption, distribution, or storage for use in consumption, of materials sold or used in Louisiana. La.R.S. 47:302(A). It is measured by the sales price if the item is sold at retail, or upon the cost price when not sold at retail but rather used, consumed, or stored for use or consumption. La.R.S. 47:302(A).
>
> Pertinently to the present issue, La.R.S. 47:301(10) defines "sale at retail" as: " * * * A sale to a consumer or to any other person for any purpose other than for resale in the form of tangible personal property. . . . The term 'sale at retail' does not include sales of materials for further processing into articles of tangible personal property for sale at retail * * *."
>
> . . . .
>
> ….V]iewing the definition of La.R.S. 47:301(10) as a whole, the better or more reasonable interpretation, we believe, is

that ***the substance cannot be regarded as purchased for processing "into" the finished article (and, thus, as non-taxable to the manufacturer), when in fact the "purpose" for which it is bought is not for incorporation "into" the manufactured product but rather only to be used in the process of producing the manufactured product for sale-at least where, as here, the inclusion of the waste residue of the substance results from an unintended (although unavoidable) inefficiency of the manufacturing process, is of no benefit to the product sold, and is of the nature of an impurity rather than of an integral part of the finished product.***

Accordingly, the *Traigle* Court recognized that the "further processing exclusion" applied to those raw materials *purposefully* incorporated within the final products (*i.e.,* not incidentally/accidentally incorporated within the final products), such that said incorporation resulted in the raw materials providing *integral* and *beneficial* parts to the final products produced….

. . . .

Several years after the *Traigle* decision, this Court was again faced with a question involving the taxability of raw materials utilized in the "further processing" of final products for resale. In *Vulcan Foundry, Inc. v. McNamara*, 414 So.2d 1193 (La.1982), [that court noted:]

**It is clear from the evidence in this case that coke is purchased for the purpose of heating the scrap iron; the small amount of carbon in the finished product is incidental.** The fact that using coke as a fuel has a beneficial side effect does not change the purpose for which it is bought. Accordingly, we conclude that Vulcan's purchase of coke is as a "consumer" for a "purpose other than for resale," that is, for its use as a heat source to melt scrap iron and *not for* further processing into an article of tangible property for sale at retail.

While recognizing that the carbon (from the coke) became an identifiable and beneficial component of the final products, the *Vulcan* Court focused upon the "purpose" for which the manufacturer purchased the raw material. As such, this Court concluded that the coke was subject to sales and use taxes because the presence of the carbon in the final products was merely incidental to the manufacturing process.

. . . .

As we previously discussed, the "further processing exclusion," which merely provides that "[t]he term "sale at retail" does not include

sale of materials for further processing into articles of tangible personal property for sale at retail," has been further explained by the DOR's own administrative rule (*i.e.,* LAC 61:I.4301). From this rule, we recognize that raw materials "further processed" into end products are excluded from the sales and use tax provisions when: (1) the raw materials become *recognizable* and *identifiable components* of the end products; (2) the raw materials are *beneficial* to the end products; and (3) the raw materials are *material for further processing,* and as such, are purchased with the *purpose of inclusion* in the end products.

. . . .

To be excluded from the sales and use tax provisions, we also agree that the raw materials must be purchased with the *purpose* of incorporating said materials into the end products. . . .

. . . .

Accordingly, to be excluded from sales and use tax, we find that the raw materials must have been purchased for the *purpose of incorporation* within the end products, as the raw materials must be **material for the further processing** of the final products produced.

It is clear from the record the purpose for which NISCO purchased the limestone and sand. Rick Zagar, NISCO's operations manager, stated in his affidavit that the petcoke burners were used because they were the most economical way to generate electricity. He noted that federal regulations limit the amount of sulfur released into the air and that those regulations "recognized limestone injection as the 'best available control technology' (BACT) for controlling the emission of sulfur from these specific types of boilers." He went on to state that the "CFB technology *requires the use of limestone,*" that "[l]imestone *is required* to be used in CFB technology," and, most damningly, that "*[t]here are no other options available.*" (Emphasis added.)

Sandi Boyles, NISCO's business manager, reiterated in her deposition that the boilers used by NISCO could not operate to make electricity without limestone. Likewise, attached to one of her affidavits is an email from Johnnie Botley, another

6

NISCO business manager, to Calcasieu regarding the sand also at issue. Therein, Mr. Botley states (emphasis ours):

Sand is utilized in the NISCO process for injection into the circulating fluidized boiler along with petroleum coke and limestone *for the purpose of generating electricity for sale*. The sand is necessary in the operation of the circulating fluidized bed boiler to prevent agglomeration (hardening) of the coke and limestone ash which would block the normal process circulation of the fluidized bed thereby causing premature shutdown of the boiler and *thus the loss of electrical power/steam production.*

Thus, it is clear from NISCO's own evidence that the purpose of the limestone was to comply with federal regulations and allow it to generate electricity for sale. NISCO even goes so far as to admit in brief that it "could not manufacture electricity and steam using CFB technology without the injection of limestone." While NISCO is able to recoup some of the money it spends on limestone by selling the ash by-product, it is clear that the production of ash is not the purpose for which the limestone is purchased.[1] The trial court made no error in its ruling that the limestone and sand were purchased to generate electricity and not for further processing. Accordingly, those purchases were not exempt from the sales and use tax.

NISCO next claims that the trial court erred in assessing penalties on the delinquent taxes because it claims it acted in good faith. Again, we disagree. As noted in *Boyd Racing, LLC v. Fruge*, 08-581, p. 9 (La.App. 3 Cir. 11/5/08), 996 So.2d 659, 665, *writ denied,* 08-2835 (La. 2/6/09), 999 So.2d 780:

This court has repeatedly held that a good faith defense is not available in tax delinquency cases, given the supreme court's decision in *St. John the Baptist Parish School Board v. Marbury–Pattillo Construction Co., Inc.,* 259 La. 1133, 254 So.2d 607 (1971). *See Mercury Cellular Tel. Co. v.*

---

[1] It should be further noted that NICSO produced electricity for years with natural gas burners that did not produce ash, further undercutting its claim that it intended to produce ash for sale. Moreover, while NISCO spent roughly $33,000,000 on limestone, it was able to sell the ash for a mere $5,000,000. While this amount clearly offsets some of the cost of producing electricity, it does not in any way change the reality that the limestone was purchased for the purpose of electrical generation, not for processing into ash.

*Calcasieu Parish,* 00–318 (La.App. 3 Cir. 12/13/00), 773 So.2d 914, *writ denied,* 01–126 (La.3/16/01), 787 So.2d 314; *Lake Charles Memorial Hosp.,* 728 So.2d 454.

We find that the narrow exception to this rule articulated in *BP Oil Co. v. Plaquemines Parish Government,* 93–1109 (La.9/6/94), 651 So.2d 1322, is inapplicable in the instant case. This assignment of error is without merit.

For the above reasons, we hereby affirm the judgments of the trial court. Costs of this appeal are assessed against NISCO.

**AFFIRMED.**